[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 04-13653
_____

D.C. Docket No. 02-60772-CV-WPD

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 21, 2007
THOMAS K. KAHN
CLERK

BUC INTERNATIONAL CORP.,
a Florida corporation,

Plaintiff-
Counter-Defendant-
Appellee,

versus

INTERNATIONAL YACHT COUNCIL LIMITED,
a foreign corporation,

Defendant-Appellant,

MLS SOLUTIONS, INC.,
a Florida corporation,

Defendant-
Counter-Claimant-
Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(June 21, 2007)**

Before TJOFLAT and BARKETT, Circuit Judges, and FULLER,[*] District Judge.

TJOFLAT, Circuit Judge:

In this copyright infringement case, the plaintiff claimed copyright protection of a factual compilation – specifically, the selection, order, and arrangement of information about yachts listed for sale – vis a vis the defendants' competing factual compilation, which came onto the scene after the plaintiff had obtained certificates of copyright registration. The case was tried to a jury, which found for the plaintiff. The defendants now appeal.[1] They raise several issues, among them whether the court erred in instructing the jury that it could find copyright infringement if there were "substantial similarities" between the original elements of the plaintiff's compilation and corresponding elements of the defendants' compilation. According to the defendants, the court should have required the plaintiff to prove that the allegedly infringing elements were "virtually identical" to the plaintiff's original elements.

We find no error in the district court's "substantial similarities" instructions or in any of the other issues the defendants raise. We therefore affirm the district court's judgment.

---

[*] Honorable Mark E. Fuller, United States Chief District Judge for the Middle District of Alabama, sitting by designation.

[1] We have jurisdiction under 28 U.S.C. § 1291.

2

I.

A.

BUC International Corporation ("BUC")[2] was founded in 1961 and publishes the BUC Used Boat Price Guide. The BUC Used Boat Price Guide lists recreational boats and yachts along with their market values. Walter Sullivan ("Sullivan"), the President of BUC, joined the company shortly after it was founded and became its President in 1971.[3] By the mid-1980s, BUC developed a computer network and software application called BUC Marine Sales & Charter Network ("BUCNET Service" or "BUCNET").

BUCNET Service was designed to create a centralized directory of yacht listings so that brokers could more easily access industry information. Before BUCNET Service came along, yacht brokers and boat dealers with central listing agreements[4] typically shared information with other brokers by mailing or faxing descriptions of their listings to each other. There was no uniformity in these listings; the yacht brokers prepared them according to their own individual

---

[2] BUC is a Florida corporation with its principal place of business located in Broward County, Florida.

[3] Sullivan was BUC's sole shareholder.

[4] A central listing agreement typically grants a broker the exclusive right to sell the yacht or boat, and prohibits the owner from listing the vessel with any other party.

methods and tastes. With the advent of BUCNET Service, brokers could share, compare, search and track the status of vessel listings on a computer, in lieu of sending listings to fellow brokers. Brokers gained access to BUCNET Service by entering into a license agreement with BUC.[5] When licensed, a broker obtained BUCNET software and a password that enabled the broker to log on to BUC's database and view, print, search and copy its listings. The vessel listings in the BUCNET database were not available to the public; only BUCNET licensees had access to these compilations. BUCNET was thus a broker-to-broker multiple listing service[6] ("MLS"), as opposed to a primarily retail-based website available to the public at large.

BUC's success with BUCNET Service was not instantaneous. It took three to four years for BUC to develop the first version of the BUCNET program and to

---

[5] In pertinent part, the "BUC Marine Sales and Charter Management System Membership and Software License Agreement" provides that:

> Licensee shall not use, sell, distribute, display, or otherwise transfer, any information obtained from the BUC Licensed System to others for any purpose provided however, that Licensee may provide printed listings of vessels for sale or charter to prospective boat buyers, sellers, or charterers on an individual basis and in such limited and reasonable quantities for their consideration. No right or license is granted herein for the use of the BUC Licensed System, databases, reports, listings or any other item delivered by BUC to Licensee hereunder, for any third person, or for any use by any third person of the BUC Licensed System.

[6] A multiple listing service, or MLS, applies within a specific market, such as the market for real estate or for the buying and selling of yachts, and provides professionals with a forum to submit and browse information about properties for sale in that market.

reach a "critical mass"[7] of licensed brokers and vessel listings. To facilitate the presentation of information on BUCNET, Sullivan developed the "Standard Listing Form and Format." A licensed broker used this schema in submitting information about a yacht unless some other arrangement would better portray the vessel at hand, in which case the broker would modify the BUCNET format. Of the thousands of vessels BUCNET listed when this case came to trial, more than ninety-eight percent were listed under the Standard Listing Form and Format.

Sullivan selected and arranged the format's section headings that appeared on the computer screen.[8] In 1997, he registered in BUC's name a copyright in the "compilation, selection and organization of [the BUCNET] database," i.e., the centralized directory of yacht listings, and obtained a Certificate of Copyright Registration from the Register of Copyrights. Sullivan thereafter renewed BUC's copyright registration in the BUCNET database annually. In some years, BUC obtained or renewed several certificates of registration. In 2002, the words "and

---

[7] According to Sullivan, "Critical mass is the point at which a new business venture is self-sustaining."

[8] These section headings were changed over time to enhance BUCNET's utility. The section headings of the BUCNET computer program as depicted in the most recent version presented at trial included: accommodations and layout; overview; vessel walkthrough; galley/laundry; electronics and navigation; electrical system; deck; hull; construction; engine and mechanical equipment; water sports and recreation; fishing equipment; sails and rigging; other features/equipment; additional salesperson's remarks; exclusions; and disclaimer.

text of vessel listings" were appended to the words "compilation, selection and organization of [the BUCNET] database." BUC placed a copyright notice on each of the vessel listings appearing on BUCNET.[9]

In June of 2000, Florida Yacht Brokers Association ("FYBA") and several other professional yacht broker associations collaborated to form International Yacht Council Limited ("IYC").[10] One of the associations' objectives in forming IYC was the creation of an online MLS for yacht listings. The associations felt a need for a MLS in addition to BUCNET because, as one of IYC's principal organizers explained, vessel listings were "scattered all over the internet with no single reference resource to search all availabilities and central listings."

In February of 2000, FYBA, acting for the associations that would form IYC, published a "Request for Proposal" soliciting third parties to submit plans for

---

[9] BUC's general disclaimer and copyright notice stated: "Specifications are provided for informational purposes only. Data was obtained from sources believed to be reliable but is not guaranteed by owner or brokers. Buyer assumes responsibility to verify all speeds, capacities, consumptions and other measurements contained herein and otherwise provided and agrees to instruct his agent/s to confirm such details prior to purchase. Vessel subject to prior sale, price and inventory changes and withdrawal from market without notice. Copyright BUC Int'l 1985-2002."

[10] IYC was formed under the laws of the British Virgin Islands. FYBA, Yacht Brokers Association of America, and Mediterranean Yacht Brokers Association were the original shareholders in IYC. Since its inception, California Yacht Brokers Association, Northwest Yacht Brokers Association, British Columbia Yacht Brokers Association, and Yacht Brokers Association of London have also become members of IYC.

developing and operating (for IYC) a yacht-based MLS.[11]  On March 7, 2001, after

considering several proposals, IYC entered into a contract with MLS Solutions,

Inc. ("MLS Solutions"),[12] to develop and manage IYC's web-based MLS.[13]

MLS Solutions developed a web-based MLS for IYC, somewhat similar to

that of BUCNET, that displayed a database of vessel listings.  The IYC site was

designed as a two part system: one part included the MLS database as a private

---

[11]  The Request for Proposal included the following requirements:

Access by the public to the MLS is to be free, presumably on the Internet.  The
basic monthly cost to IYC members for both uploading and downloading of
information and for technical support shall not exceed $150 per month.  IYC is to
receive 10% of the gross income from the MLS, including any advertising income
from both public and member access to the MLS.  The MLS [developer/operator]
and IYC will have a three-year commitment from the time the system is
functioning and available to IYC members and the public.  The IYC members will
own all of the intellectual property and proprietary information associated with the
MLS from the moment of its conception until the system is fully functional.  The
system will be held in escrow for IYC by the [developer/operator] during the three
year commitment.  Only Central Listings will be allowed on the MLS.  Terms of
each listing will be supplied by the member brokerage submitting the listing.  Two
levels of access will be allowed to the MLS data, one for the public and one for
the brokers.  Uploading information for public access will be at the discretion of
the member brokerage.  A Communication Bulletin Board for member brokerages
will be made available and supported by the MLS [developer/operator].  The MLS
[developer/operator] will provide for the design and management of Web Sites for
FYBA and other associations that might become stockholders of IYC.  The MLS
[developer/operator] will provide a host server capable of handling the submission
of data by members and the inquiries by members and the public in a timely
manner.  Response shall include quantification of data transfer rates and plans for
growth over time.

[12]  MLS Solutions is a Delaware corporation.

[13]  For the sake of clarity, we use the acronym "MLS" to refer generically to a multiple
listing service, and the phrase "MLS Solutions" to signify IYC's co-defendant.

7

site for brokerage business, and the other part operated as a public website.[14]

Vessel listings were placed on the IYC website by MLS Solutions. MLS Solutions received the listings from the brokers via email or fax. Many of these brokers were BUCNET licensees. In sending listings to MLS Solutions, these BUCNET licensees would simply copy the listings they had submitted to BUC, and MLS Solutions would, in turn, place them on the IYC website.[15] By January 2002, brokers and salesmen numbering nearly 700 had listed over 4,100 boats on IYC's MLS. Approximately 2,700 of those listings were derived from BUCNET listings. Some of these were furnished by BUCNET licensees. Others were obtained by MLS Solutions' staff who had acquired BUCNET passwords from

---

[14] Only brokers who belonged to an IYC association had access to the private brokerage site at www.yachtcouncil.org. Anyone could access the public website at www.yachtcouncil.com.

[15] A person with access to BUCNET could "copy and paste" a vessel listing by entering BUCNET, viewing the pertinent listing on the computer screen, highlighting the vessel listing with the cursor, copying it, and pasting it in a word processing document. By copying the listing, rather than typing it all over again for submission to MLS Solutions, the broker saved considerable time, effort, and expense. A broker, copying and pasting in this fashion, would attach the document to an email and send it to MLS Solutions. A broker, or someone with access to BUCNET, could also highlight and cut the relevant portions of the document and paste them onto the IYC website. The listing secretaries at MLS Solutions were instructed as follows with respect to copying and pasting:

> When copying and pasting from a listing document to the Yachtcouncil.org MLS, please keep in mind the following: 1. Your document must be in "Normal Style." 2. Font size does not matter as it will default after submitting to 12 pts. 3. Strip your document from any tables as the table parameters could cause offset margins. Tables from other applications are defaulted to follow their set up, which may not yield to ours[.]

8

BUC licensees.  When BUC realized how MLS Solutions was acquiring the listings it was posting on IYC's website, BUC started placing "markers," a series of symbols and letters, in the middle of each listing.  BUC had programmed BUCNET to enable it to determine the identity of the licensee who owned the password and when (i.e., the exact time) the password-holder accessed BUCNET and viewed a listing.  When the listing later appeared on IYC's MLS, BUC could locate the marker and identify the owner of the password.  Using these markers, BUC discovered that IYC's MLS presented over 4,400 listings which replicated BUCNET listings.[16]  These IYC listings bore not only the BUCNET markers, but many also contained BUC's copyright notice.

## B.

On June 5, 2002, BUC brought this lawsuit against IYC, MLS Solutions, and MLS Solutions' president, William Pazos, for copyright infringement, seeking injunctive relief and damages.[17]  BUC promptly moved the district court for a

---

[16] BUC discovered the markers by looking at the listings on IYC's public website.

[17] BUC's complaint contained 12 counts, five of which alleged copyright infringement against the defendants named in the text, supra.  The complaint also contained an assortment of common law tort and statutory claims against these defendants and others.  The complaint was amended twice, the final version containing 14 counts.  The counts that were added were tort claims.  The claims against the other defendants were disposed of before trial or by a Fed. R. Civ. P. 50(a) judgment as a matter of law at trial.  The non-copyright claims against IYC, MLS Solutions and Pazos were similarly disposed of before trial or under Rule 50(a); none is pertinent to this appeal.

preliminary injunction, and on July 1, 2002, the court held an evidentiary hearing on the motion. Four days later, the court ruled on the motion. BUC Int'l Corp. v. Int'l Yacht Council Ltd., No. 02-60772-CIV, 2002 WL 31399604 (S.D. Fla. July 5, 2002)(order granting in part mot. for prelim. inj.).

First, addressing the likelihood that BUC would prevail on the merits, the court found that BUC had valid copyrights in the compilation of the BUCNET Service database to the extent that listings in the database used "descriptive words," and that the defendants had copied original elements of the compilation. Id. at *2–4. Second, the court found that absent an injunction, BUC would likely sustain irreparable injury. Id. at *4. Third, balancing the equities, the court concluded that the injury BUC would sustain if the defendants were not enjoined outweighed the harm an injunction would cause the defendants. Id. Fourth, the court found that an injunction would not be contrary to the public interest. Id. The court therefore enjoined the defendants from "copying descriptive expressions" from BUC's MLS listings and ordered the defendants to remove them from the IYC website. Id.

After this injunctive order, the parties engaged in exhaustive discovery and amended their pleadings. The claims subsequently tried to a jury were framed as follows: three counts against IYC for direct, vicarious, and contributory copyright

10

infringement, respectively; one count against MLS Solutions for contributory copyright infringement; and one count against Pazos for contributory copyright infringement. The defendants admitted that BUC had obtained certificates of registration for the copyrights described in the complaint but denied the validity of those copyrights on the ground that nothing in the compilation, selection and organization of the database constituted an original work of authorship. The defendants also relied on several affirmative defenses which the district court submitted to the jury: that they were entitled to use BUC's compilation under the fair use doctrine; that they had an implied license from BUC; that BUC had waived its right to copyright protection; and that BUC had unclean hands. In addition to asserting these defenses, the defendants filed counterclaims seeking a declaration that BUC's copyrights were invalid on grounds, among others, that nothing in the claimed copyrights constituted an original work of authorship.

C.

The trial began on March 22, 2004. BUC established the facts set out in part I. A., supra, and rested. The defendants then moved for judgment as a matter of law. The district court denied their motion, and they proceeded to put on their

defenses.[18]  At the close of all the evidence, they again moved for judgments as a matter of law, and the court denied their motions.  Following closing argument, the court submitted the case to the jury on a charge that described the three means of copyright infringement: direct, vicarious, and contributory;[19] spelled out BUC's burden of proof; and stated the elements of the defendants' affirmative defenses. On the parties' stipulation, the jury received the following interrogatories, which we reproduce along with the jury's answers:

We, the Jury, return the following verdict[s]:

1.    Does BUC own valid Copyright Registrations?
           Answer Yes or No:      YES

If you answered Yes to Question #1, please proceed to Question #2.
(If you answered No to Question #1, then you have ruled against
BUC on its copyright infringement claim, and you need not answer

---

[18]  The court granted the defendants' motions on BUC's remaining non-copyright claims, a ruling that is not before us.

[19]  Direct copyright infringement arises upon violation of the exclusive rights of a copyright holder under 17 U.S.C. § 501.  Even though the Copyright Act does not specifically provide for secondary liability, vicarious and contributory copyright infringement are well established principles derived from common law.  Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930–31, 125 S. Ct. 2764, 2776, 162 L. Ed. 2d 781 (2005). Contributory copyright infringement refers to the intentional inducement, causation or material contribution to another's infringing conduct.  Greenberg v. Nat'l Geographic Soc., 244 F.3d 1267, 1271 n.6 (11th Cir. 2001), abrogated on other grounds by, New York Times Co., Inc. v. Tasini, 533 U.S. 483, 121 S. Ct. 2381, 150 L. Ed. 2d 500 (2001), as recognized by, Greenberg v. Nat'l Geographic Soc., No. 05-16964, ___ F.3d ____, 2007 WL 1693056 (11th Cir. June 13, 2007).  Liability for vicarious copyright infringement arises "when the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement."  Grokster, 545 U.S. at 931 n.9.

12

the remaining questions.)

2.      Did any of the Defendants infringe BUC's copyrighted works?
             Answer Yes or No:      <u>YES</u>

If you answered Yes to Question #2, please proceed to Question #3.  (If you
answered No to Question #2, then you have ruled against BUC on its
copyright infringement claim, and you need not answer the remaining
questions.)

3.      If you answered Yes to Question #2, indicate which
        Defendant(s) is/are liable for copyright infringement:

International Yacht Council Limited (IYC)  Answer Yes or No:      <u>YES</u>
MLS Solutions, Inc. (MLS)                          Answer Yes or No:      <u>YES</u>
William Pazos                                             Answer Yes or No:      <u>NO</u>

4.      BUC has the right to elect to recover either its actual damages
        (with respect to all of the infringed listings) or statutory
        damages (with respect to the up to 1,464 listings alleged to be
        infringed after the effective date of the applicable registration).

        What were BUC's actual damages sustained as a result of the
        copyright infringement?
             <u>$1[,]598,278</u>

What is the amount of statutory damages BUC would be entitled to recover
if it so elects as a result of the infringement of listings which occurred after
the effective date of the applicable registrations?
<u>1464</u>                    x      <u>$750.00</u>     =      <u>$1[,]098,000</u>
number of listings            statutory amount per listing

SO SAY WE ALL.
        DATED:      <u>April 7th, 2004</u>

The jury returned its verdicts on April 7, 2004.  With these verdicts in hand,

13

the district court promptly granted BUC a permanent injunction against IYC and MLS Solutions and entered a declaratory judgment in favor of BUC on the defendants' counterclaims. The provisions of the permanent injunction mirrored those of the preliminary injunction; IYC and MLS Solutions were enjoined from copying descriptions of yachts or features on yachts from BUC's listings, and from maintaining any copies of those listings on IYC's website. After the verdict, the defendants, now IYC and MLS Solutions, renewed the motions for judgment as a matter of law they made at the close of all the evidence,[20] and alternatively moved for a new trial.[21] The court denied their motions and entered final judgment for BUC against IYC and MLS Solutions, and for Pazos, in conformance with its previous dispositive rulings. IYC and MLS Solutions then lodged this appeal.

IYC and MLS Solutions jointly assert the following arguments in their opening brief on appeal: (1) the district court erred in denying their motions for judgment as a matter of law; (2) the court erred in instructing the jury that, to establish its copyright infringement claims, BUC had to prove that IYC's listings were "substantially similar" to BUC's listings, whereas the court should have instructed the jury, in accordance with defense counsel's request, that BUC had to

---

[20] See Fed. R. Civ. P. 50(b).

[21] See Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59.

14

prove that IYC's listings were "virtually identical" to BUC's listings; (3) the court erred in declaring that BUC's copyrights were valid; (4) the court abused its discretion in admitting BUC's evidence regarding the causation of actual damages; and (5) the court abused its discretion in charging the jury on statutory damages. We dispose of the fourth and fifth assertions in the margin,[22] and address the first three in the following text.

## II.

## A.

IYC and MLS Solutions contend that the district court should have granted their motions for judgment as a matter of law on the grounds that (1) BUC's copyright registration in its "compilation" database did not extend protection to

---

[22] (4) The contested evidence regarding actual damages consisted of an accountant's report, which detailed the actual damages the infringements caused BUC, and the accountant's testimony. The defendants agreed in the parties' joint pretrial stipulation that the report would be admitted into evidence at trial without objection. At trial, however, the defendants objected to the admission of the report and the accountant's subsequent testimony on the grounds that the report lacked foundation, was cumulative, and was based on hearsay, and that the accountant was testifying outside the scope of his expertise. The district court overruled the objections because the defendants' execution of the pretrial stipulation operated to waive any objection they might have to the report, and the court further ruled that the accountant was qualified to give the testimony he gave, which was essentially an explanation of what the report contained. We cannot fault the district court's ruling. (5) BUC had the right, under 17 U.S.C. § 504(c), to elect whether to accept actual damages or statutory damages. Section 504(c) states: "Except as provided by clause (2) of this subsection, the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action[.]" Any error the court may have committed in charging the jury was rendered moot because BUC elected to accept actual damages.

15

the individual vessel listings, i.e., BUC failed to register a copyright in each listing; (2) BUC's work did not satisfy the definition of a compilation contained in 17 U.S.C. § 101 because the material found on BUCNET did not "preexist" the listings;[23] and (3) BUC's compilation lacked originality. The problem appellants face is that the first two grounds were not cited in their motions for judgment as a matter of law made at the close of all the evidence. As a general rule, we do not consider issues not presented in the first instance to the trial court.[24] See, e.g., Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1284–85 (11th Cir. 2003) (stating that a federal appellate court generally will not consider an issue that was not raised before the trial court). We adhere to that rule here. As for the third ground, only MLS Solutions preserved under Rule 50(b) the argument that BUC's compilation lacked originality as a matter of law.[25]

---

[23]  Under § 101, a compilation is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes collective works." 17 U.S.C. § 101.

[24]  In unusual circumstances, we have noticed plain error in a civil case. See, e.g., Maiz v. Virani,  253 F.3d 641, 676–77 (11th Cir. 2001)(describing such cases as "exceptional"). In this case, neither appellant asks that we notice plain error in the court's refusal to grant judgment as a matter of law on the first two grounds cited in the text supra, and we discern none.

[25]  Although IYC moved for judgment as a matter of law at the close of all the evidence, it did not challenge the originality in BUC's compilation at that time. Instead, IYC attacked the sufficiency of the evidence establishing that it had actually infringed the copyright under either a direct, contributory or vicarious infringement theory, regardless of whether BUC's compilation was original. In other words, IYC asserted that there was no evidence that it copied from BUC,

16

In evaluating the argument that BUC's compilation lacked originality, we commence with the basic tenets of copyright law.[26] The Copyright Act of 1976 extends protection to "original works of authorship fixed in any tangible medium of expression . . . [.]" 17 U.S.C. § 102(a). While the Act protects original expression, it is well established that this protection does not extend to any underlying facts or ideas. See 17 U.S.C. § 102(b);[27] Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345, 111 S. Ct. 1282, 1287, 113 L. Ed. 2d 358 (1991). Compilations of facts, however, may be copyrightable. See 17 U.S.C. § 103;[28] Feist, 499 U.S. at 344, 111 S. Ct. at 1287. In Feist, the Supreme Court

---

induced any infringement, or had the right to supervise MLS Solutions. Alternatively, IYC challenged BUC's satisfaction of the registration prerequisite for filing an infringement action, contending that BUC's group copyright registrations were invalid because they failed to meet the publishing requirements of United States Copyright Office Circular 65. IYC presents neither argument in the brief it filed with MLS Solutions here.

[26] In determining whether the district court erred in denying MLS Solutions' motion for judgment as a matter of law on the originality issue, we bear in mind that "[j]udgment as a matter of law is appropriate only if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001) (citing Slicker v. Jackson, 215 F.3d 1225, 1229 (11th Cir. 2000)).

[27] "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

[28] 17 U.S.C. § 103(a) provides, in pertinent part, "The subject matter of copyright as specified by section 102 includes compilations and derivative works[.]"

navigated the tension in the ambit of copyright protection for factual compilations: compilations are afforded copyright protection, while facts themselves are not. 499 U.S. at 344–45, 111 S. Ct. at 1287. Originality, the Court explained, mandates this legal distinction; it is "[t]he sine qua non of copyright," and means that "the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." 499 U.S. at 345, 111 S. Ct. at 1287. Synthesizing these principles, "the Court held that a compiler's selection, arrangement and coordination, if original, are the only protectable elements of a factual compilation." BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc., 999 F.2d 1436, 1440 (11th Cir. 1993) (en banc) (emphasis added) (citing Feist, 499 U.S. at 348, 111 S. Ct. at 1289).

What is sufficiently original to merit copyright protection for a factual compilation? While originality is not a rigorous standard, "the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever." Feist, 499 U.S. at 362, 111 S. Ct. at 1296. In Feist, the Court held that the copyright holder's selection, coordination, and arrangement of facts, i.e., its compilation, lacked the requisite originality because the copyright holder simply took data and arranged it alphabetically in its telephone white pages directory. Id. Neither the copyright holder's "selection" of basic information

18

about people applying for telephone service (name, town and telephone number) nor its alphabetical "coordination and arrangement" of that information was original. Id. at 362–63, 111 S. Ct. at 1296–97.

Similarly, in BellSouth Advertising & Publishing Corp. v. Donnelley Information Publishing, Inc., we applied the Feist originality analysis to a copyright infringement action concerning a "yellow pages" classified business directory and held that the selection, coordination and arrangement of facts in the directory lacked the minimal degree of creativity necessary for copyright protection. 999 F.2d at 1441–42. In terms of selection, we distinguished between "a creatively original selection of facts" and "the creative means used to discover those facts." Id. at 1441. While the former is protected as an original work of authorship, the latter, i.e., methods used to discover facts and/or collect data, are not. Id. We also held that "an alphabetized list of business types, with individual businesses listed in alphabetical order under the applicable headings," was not an original coordination and arrangement of facts. Id. at 1442. A bedrock of these cases is the precise identification of what, if any, elements in the compiler's selection, coordination and arrangement of facts are original. As we discuss infra, the standard for copyright infringement of factual compilations hinges on distinguishing original elements of creative authorship from components in the

19

public domain.

Turning now to the mechanics for bringing an infringement action, it is important to note that "[f]or . . . original works of authorship created after 1977, copyright automatically inheres in the work at the moment it is created without regard to whether it is ever registered." Montgomery v. Noga, 168 F.3d 1282, 1288 (11th Cir. 1999) [(citing 17 U.S.C. § 102(a); Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc., 29 F.3d 1529, 1531 (11th Cir. 1994); Melville B. Nimmer & David Nimmer, 2 Nimmer on Copyright § 7.16[A][1] (1998))]. While "registration is not a condition of copyright protection," 17 U.S.C. § 408(a), it is a prerequisite for bringing an action for copyright infringement. See 17 U.S.C. § 411(a).[29] Upon proper commencement of the copyright infringement action, the copyright holder must prove both: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist, 499 U.S. at 361, 111 S. Ct. at 1296 (citation omitted).

MLS Solutions challenges the "originality" of BUC's compilation in three ways.[30] First, MLS Solutions contends that BUC is not the owner of a valid

---

[29] Section 411 provides, in pertinent part, "no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a).

[30] MLS Solutions' challenges tend to bleed into each other. For ease of discussion and analysis, we break them down into three discrete arguments.

copyright because the brokers were the real "authors" of the selection and arrangement of the section headings in the compilation, i.e., BUC was not the "origin" of the selection and arrangement. Second, assuming for the sake of argument that BUC owned a valid copyright, MLS Solutions claims that the merger doctrine precludes protection for BUC's selection of section headings. Finally, MLS Solutions argues that BUC's selection and arrangement of section headings lack the minimal creativity necessary to constitute an original work of authorship. We consider these points in order.

MLS Solutions' first point is that the brokers, not BUC, were the authors of the compilation because they had the option of using the BUCNET standard format or manually selecting their own section headings and arrangement. This contention lacks merit because the evidence shows that the brokers modified the BUCNET format for the section headings in only 40 to 50 of the 4,667 listings referred to at trial – a mere two percent of listings. The effectively non-exercised ability to alter the standard format in the selection and order of the section headings did not render the brokers "authors" of the compilation, nor did it destroy BUC's authorship in the compilation that it created and used.[31] In short, broker

_____

[31] While MLS Solutions claims that different headings were used in the listings and that they were not always displayed in the same order, the evidence shows that these differences were due to the evolution of BUC's standard format over time and not due to broker alteration. As

21

deviation from the BUCNET format of section headings was <u>de minimis</u>, and the district court did not err in denying MLS Solutions' motion for judgment as a matter of law on this ground.

Second, MLS Solutions contends that BUC's selection of section headings does not survive application of the merger doctrine. The merger doctrine provides that "expression is not protected in those instances where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself." <u>BellSouth</u>, 999 F.2d at 1442 (citing <u>Kregos v. Associated Press</u>, 937 F.2d 700, 705 (2d Cir. 1991)). As noted above, copyright normally protects the expression of ideas, but not the ideas themselves. <u>See</u> 17 U.S.C. § 102(b). For example, the idea of hunting a formidable whale at the lead of an eccentric captain is not protected by copyright law. The expression of this idea as it is encapsulated in the novel <u>Moby-Dick</u>, however, is protected by copyright.[32]

The merger doctrine operates as an exception to the normal idea-expression dichotomy. The doctrine holds that, when there are so few ways of expressing an

---

recounted above, broker deviation from the standard format accounted for a <u>de minimis</u> amount of change in the total number of listings.

[32] This example is for the purpose of illustration only. Herman Melville's novel, <u>Moby-Dick</u>, was first published in 1851, and is now part of the public domain.

idea, not even the expression is protected by copyright. To illustrate this point, imagine the symbol often used on public signs displaying a circle with a diagonal line crossed through it. When, for example, an image of a cigarette is centered in the middle of the circle with the line through it, this visual sign expresses the idea that smoking is not allowed. This same symbol is used in a wide variety of contexts to express that something is prohibited, e.g., no swimming, no food or drink, no cell phone. Since there are effectively only a few ways of visually presenting the idea that an activity is not permitted, copyright law would not protect the expression in this case, i.e., the circle with the line through it.

Here, MLS Solutions argues that there are so few ways of effectively describing a boat, that BUC's selection of section headings should not receive copyright protection. It claims that recognizing BUC's copyright in the selection of its section headings would be tantamount to BUC owning the "idea of dividing vessel listings by rooms, functional and aesthetic features of the vessel." In essence, MLS Solutions defines the "idea" at issue very narrowly: organizing a vessel listing by using section headings that highlight rooms or other features of the boat.

The most recent version of BUC's section headings (appearing on BUCNET listings) that was presented at trial included: accommodations and layout;

23

overview; vessel walkthrough; galley/laundry; electronics and navigation; electrical system; deck; hull; construction; engine and mechanical equipment; water sports and recreation; fishing equipment; sails and rigging; other features/equipment; additional salesperson's remarks; exclusions; disclaimer.[33] According to MLS Solutions, the merger doctrine precludes copyright protection over BUC's selection because BUC has expressed the idea of organizing a vessel listing by using standard industry terms, such as rooms, mechanical equipment, and so forth. With a limited number of industry terms available to express the idea of describing a vessel, MLS Solutions contends that the expression has merged with the idea.

In addressing MLS Solutions' argument, we note the tension in the underlying policies of the idea-expression dichotomy and the merger doctrine. On the one hand, we do not want to grant a monopoly over an idea. On the other hand, we seek not to frustrate the goal of securing copyright protection for original expressions of authorship. At the margins, the distinction between idea and expression can be subtle and difficult. Mindful of these principles, we turn to the application in this case.

The first relevant inquiry in deciding how to apply the merger doctrine calls

---

[33] See supra note 8.

for a determination of precisely what the "idea" and its "expression" are. Generally speaking, BUC's idea was how to present brokers with information about a boat. BUC expressed this idea by selecting certain features of a boat that it thought would be important to brokers, and arranging them according to what Sullivan thought was the most important information first. While MLS Solutions would have us define the "idea" more narrowly, i.e., dividing a vessel listing by rooms or other features of a boat, we think that definition skews the analysis in favor of finding merger. Articulating the idea and expression is not merely an exercise in semantics; it is a policy decision that must be carefully drawn. By defining the idea around the contours of the chosen expression, MLS Solutions attempts to cast the idea and the expression as one. This type of analysis would swallow up the idea-expression dichotomy, and the merger doctrine would become the rule instead of the exception. A more balanced conception of the "idea" here yields the conclusion that BUC's idea was to present yacht brokers with information about boats. Under this definition, MLS Solutions' argument is, in effect, reduced to the suggestion that the only way to describe a boat for the purposes of a vessel listing is to use the section headings that BUC selected for its compilation. In other words, MLS Solutions must argue that the idea of presenting brokers with information about boats can only be expressed in very few

25

ways – namely, using BUC's selection of section headings.

The testimony at trial belies MLS Solutions' argument. Brokers testified that, prior to BUCNET, there was no uniformity in the way information about yachts was presented – brokers used different headings and organized information in different formats for their vessel listings. BUC admitted into evidence vessel listings from various companies that were not generated using the BUCNET standard format. While some of these listings featured section headings used in the BUCNET standard format (such as "mechanical equipment" and "accommodations"), they varied substantially in the overall selection and arrangement of this information. The variety in the listings demonstrates that there are many ways to select and organize information in a yacht listing. The number of potential expressive options indicates that BUC's selection of section headings did not merge with the larger idea of describing a yacht. In that same vein, MLS Solutions is not foreclosed from using industry terms like "galley" or "hull;" it simply cannot use them in the same manner in which BUC did.

MLS Solutions' final reason why the district court erred in denying its motion for judgment as a matter of law is that BUC's compilation lacks the minimal degree of creativity necessary for an original work of authorship. BUC presented evidence of originality in the form of testimony from Sullivan and a

BUC licensee. Sullivan said that he evaluated what he thought was the most critical information for the brokers and structured BUC's compilation based on those assessments. Joseph Marino, a yacht broker and BUC licensee, testified to the state of affairs in the yacht market prior to the establishment of BUCNET, and the lack of uniformity in organizing vessel listings: "There wasn't anything in the industry before. It was just a hodgepodge of what I, as a salesperson and broker, decided to send out. And each one was a little different, a variation of something else." When counsel for BUC asked Marino whether BUC's selection and arrangement were original, Marino responded, "Yes. Absolutely."

The defendants attempted to cast doubt on the originality of BUC's compilation through both cross-examination of BUC's witnesses and testimony that defense witnesses gave. They cross-examined Sullivan, and tried to undermine his credibility about originality by pointing out the more expansive view of copyright ownership and originality that he had held prior to trial. For example, Sullivan at one time claimed that BUC owned all of the rights in the compilation, selection and organization of the text, codes and data contained within the BUCNET Service database. By the time the trial commenced, though, BUC's copyright claim was limited to the organization, selection and arrangement of data in the vessel listings. As to the originality of selection, the defendants

27

attempted to show that terms like "vessel walkthrough" and "master stateroom" predated BUCNET and had been used in the boating industry for years. Allan Gardner, Chief Technology Officer for MLS Solutions, testified that the categories and subcategories on BUCNET were common terms and by no means unique or original. According to him, the broker was ultimately responsible for the selection of the headings employed; moreover, the order and arrangement of the listings was based on common sense and did not add any "real value."

Having reviewed the record, we find no error in the district court's denial of MLS Solutions' motion for judgment as a matter of law. BUC and the defendants introduced conflicting testimony in support of their respective positions regarding the originality of the BUCNET compilation. BUC presented evidence of the creativity that went into the selection, order and arrangement of its compilation, highlighting the "work of authorship" that emerged from a motley sea of vessel listings. The defendants, on the other hand, tried to depict a banal compilation of information. Considering the "swearing match" over originality, we cannot say that the court should have resolved the originality issue as a matter of law.

B.

Appellants next contend that they should be afforded a new trial because the district court erred in instructing the jury that it could find copyright infringement

28

if there were "substantial similarities" between the original elements of BUC's compilation and the corresponding elements of the defendants' compilation. Instead of using the words "substantial similarities," appellants submit that, as they requested, the court should have instructed the jury that in order to find copyright infringement, it had to find that elements of the defendants' compilation were "virtually identical" to the original elements of BUC's compilation.

To assess the merits of appellants' argument, we consider how the district court went about fashioning the charge it delivered to the jury. We focus, in particular, on the court's handling of the instructions the parties asked to be included and the objections defense counsel interposed to instructions the court employed.

1.

On September 22, 2003, the district court entered an order instructing the parties to submit jury instructions by March 12, 2004. The parties complied with the order. Both sides requested the court to instruct the jury that copyright infringement could be found if elements of the infringing compilation were substantially similar to the original elements of BUC's compilation.[34] Both sides

_____

[34] The defendants proposed the following instruction: "Any person who has access to and who either copies original elements of or creates a work that is substantially similar to a copyrighted work during the term of the copyright without the owner's permission infringes the

29

proceeded to try the case with the "substantial similarity" standard in mind.[35]

The trial began on March 22, 2004. On April 2, a Friday, the parties rested their cases, and the court entertained the defendants' motions for judgment as a matter of law. The court denied the motions and immediately convened a charge conference. The court began the conference by giving counsel a draft of the instructions it proposed to give. Included in the draft were the instructions at issue here.[36] They read as follows:

> The plaintiff claims that defendant copied original elements of the plaintiff's copyrighted work. The plaintiff has the burden of proving the following elements by a preponderance of the evidence: 1. that defendant had access to the plaintiff's copyrighted work; and 2. that there are substantial similarities between the defendant's work and original elements of the plaintiff's copyrighted work. [To find for the plaintiff,] you must find that defendant copied the selection,

copyright." Works have "substantial similarity" if "an ordinary person would conclude that both the ideas and the expression of those ideas in the two works are in fact substantially similar." BUC proposed the following instruction: "BUC can establish copying [if] . . . Defendants had access to the BUC listings, and. . . there are substantial similarities between the IYC listings and the original elements of the BUC listings. . . . Works are substantially similar if an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work."

[35] For example, in its opening statement to the jury, BUC's counsel told the jury that BUC would show that the defendants' compilation bore a "substantial similarity" to the original elements of BUC's compilation, and defense counsel voiced no objection to his use of those words.

[36] The record does not contain the draft the court gave counsel. Nonetheless, we are satisfied that the "substantial similarity" instructions we quote in the following text were contained in the court's draft since the court reporter's transcript of the charge conference reveals no change in the "substantial similarity" instructions.

coordination or arrangement of plaintiff's compilations.  If the plaintiff does not have explicit proof of copying, the plaintiff may show copying by demonstrating that defendant had access to the copyrighted work and by showing that there is a <u>substantial similarity</u> between the copyrighted work and defendant's work.  Works are <u>substantially similar</u> if: 1. the ideas in the plaintiff's copyrighted work and in the defendant's work are <u>substantially similar</u>; and 2. the expression of ideas in the plaintiff's copyrighted work and the expression of ideas in the defendant's work are <u>substantially similar</u>. The test for expression of ideas is whether an ordinary reasonable person would find the total concept and feel to be <u>substantially similar</u>.

(emphasis added).[37]

The court and counsel went over the court's draft page by page.  When they arrived at the instructions quoted above, defense counsel objected to the court's use of the words "substantial similarity" and asked the court to use the words "virtual identicality" instead, relying on "Apple Computer v. Microsoft" as their authority.[38]  Defense counsel did not formally withdraw the "substantial similarity" instructions that they previously submitted.  Nor did they present the

---

[37]  The instructions referred to "defendant" in the singular.  In charging the jury, the court made it clear that "defendant" referred to each of the defendants before it, IYC, MLS Solutions, and Pazos.

[38]  Counsel represented that "Apple Computer v.  Microsoft" applied the "virtual identity" standard to the "look and feel" elements of a copyright infringement claim involving a compilation.  Counsel did not identify the <u>Apple Computer</u> court, provide a citation for the case, or indicate whether the subject matter implicated in that case was materially similar to the compilation involved in the instant case.  In their opening brief in this appeal, appellants cite the case as "<u>Apple Computer v. Microsoft Corp.</u>, 35 F.3d 1435 (9th Cir. 1994)."  (Appellants' Br. iii).

court with a set of substitute instructions. Rather, they simply requested that "virtual identicality," or "virtually identical," be substituted for the words "substantial similarity," or "substantially similar." The court overruled counsel's objection, stating that it would give the challenged instructions.

After the rest of the instructions contained in the district court's draft had been discussed, the charge conference adjourned for the weekend, with this caveat – the court would consider further objections to the instructions it proposed to give, or requests for additional instructions, if made in writing and hand delivered to the court's chambers by 10:00 o'clock Monday morning. The parties' closing arguments to the jury would commence that afternoon at one.

On Monday morning, defense counsel filed a notice of supplemental authority, Nautical Solutions Mktg., Inc. v. Boats.com, No. 8:02-CV-760-T-23TGW, 2004 WL 783121, at *3 (M.D. Fla. Apr. 1, 2004), in support of their objection to the court's use of the "substantial similarity" standard, and renewed their request that the court use the "virtual identicality" standard instead.[39] Counsel did not reduce their requested instructions to writing, however,

---

[39] The notice of supplemental authority stated: "Nautical Solutions . . . addresses many of the exact issues raised in the case in the very same industry and as to the same matter, brokers' listings. . . . Among other things, . . . the decision holds that as to a claim of compilation as to yacht listings, the 'virtual identicality' standard applies, citing well-established Eleventh Circuit authority, and that differences in yacht listing display formats is conclusive in finding that such formats are not virtually identical. . . . Defendants respectfully request that the Court instruct the

32

or otherwise provide the court with the substance of the instructions they wanted; they evidently believed that inserting the words "virtual identicality" for "substantial similarity" was all that was necessary.

When court reconvened at one o'clock Monday afternoon, defense counsel called the court's attention to their notice of supplemental authority. In the absence of the jury, counsel once again asked the court to make the "virtual identicality" substitution they had been requesting. After noting that counsel had not submitted the substitute instructions in written form, the court denied counsel's request.

2.

Appellants contend that it would have been a simple matter for the court to make the substitution it suggested. All the court had to do was strike out two words and substitute two others; as amended in this way, the instructions would have expressed the "virtual identicality" standard correctly and in full. Assuming arguendo that this is so, however, does not answer the question of whether the "virtual identicality" standard applies in a compilation scenario such as the one presented here. To answer that question, we must consider the standard that the

---

jury on the 'virtually identical' standard[.]" (Defs.' Notice of Newly Issued Supplemental Authority Apr. 5, 2004).

cases – in particular, this circuit's cases – have used in resolving claims for the infringement of factual compilations.

We begin with the observation that, in general, the standard for copyright infringement is "substantial similarity."[40] See Warren Publ'g, Inc. v. Microdos Data Corp., 115 F.3d 1509, 1516 n.19 (11th Cir. 1997) (en banc). This standard occupies a non-quantifiable value on the legal spectrum between no similarity and identicalness. 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A] (2006); see also Bateman, 79 F.3d at 1543 n.25 ("Two works need not be identical in order to be deemed 'substantially similar' for purposes of copyright infringement."). While the works need not be identical, there must be sufficient congruence between the original elements of the copyrighted work and the copied work such that a jury could find infringement.

The "substantial similarity" standard applies to actions for the infringement of factual compilations. See, e.g., Warren Publ'g, 115 F.3d at 1516 n.19;

---

[40] As discussed earlier, to establish a claim of copyright infringement, the plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991). As our circuit has clarified, the second prong of Feist – copying – is satisfied by showing both factual and legal copying. See, e.g., Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1541–42 (11th Cir. 1996). Our present discussion of "substantial similarity" refers to actionable appropriation rather than the baseline factual question of whether the defendant actually used the plaintiff's material. See Beal v. Paramount Pictures Corp., 20 F.3d 454, 459 n.4 (11th Cir. 1994).

34

BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc., 999 F.2d 1436, 1445 n.22 (11th Cir. 1993) (en banc) (quoting Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc., 945 F.2d 509, 514 (2d Cir. 1991)).  The nuances of the "substantial similarity" test vary, however, depending on the nature of the copyrighted work at issue.  For example, in cases involving a compilation, "substantial similarity" imparts a narrowed construction.  BellSouth, 999 F.2d at 1445 n.22.

> [T]he components of a compilation are generally in the public domain, and a finding of substantial similarity or even absolute identity as to matters in the public domain will not suffice to prove infringement.  What must be shown is substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation.

Id. (quoting Key Publ'ns, Inc., 945 F.2d at 514).  Given the teachings of Feist, it is the original selection and arrangement of the collected data that bear legal significance for factual compilations.  See Feist, 499 U.S. at 348, 111 S. Ct. at 1289 ("[E]ven a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.")(citation omitted).

By comparison, the "virtual identicality" standard calls for a greater degree of similarity between the copyrighted work and the allegedly infringing work than does "substantial similarity."  MiTek Holdings, Inc. v. Arce Eng'g Co., 89 F.3d

35

1548, 1558 n.24 (11th Cir. 1996). "Virtual identicality," as adopted in this circuit, applies to "claims of compilation copyright infringement of nonliteral elements of a computer program."[41] Id. at 1558. MiTek involved a copyright infringement claim for the "selection, coordination, and arrangement embodied in [a computer] program and its user interfaces." Id. We recognized that "a user interface, [such as] a screen display (itself an audiovisual work), may be entitled to copyright protection as a compilation." Id. Ultimately, we affirmed the district court's decision that "virtual identicality" between the two implicated programs was lacking because, in part, one program "depict[ed] its commands as icons in the Windows environment" while the other program displayed them as words. Id. at 1559 (quoting MiTek Holdings, Inc. v. Arce Eng'g Co., 864 F. Supp. 1568, 1584 (S. D. Fla. 1994)). We note that MiTek, while not elaborating on the basis for its adoption of the "virtual identicality" standard, did make clear that its application of the standard was specific to the type of compilation copyright claim in that case, i.e., "claims of compilation copyright infringement of nonliteral elements of a

---

[41] The "nonliteral elements" of a computer program "are the products that are generated by the [computer] code's interaction with the computer hardware and operating program(s). Examples of nonliteral elements of a computer program include its screen displays and the main menu and submenu command tree structure contained thereon." MiTek, 89 F.3d at 1555 n.15.

36

computer program."[42]  Id. at 1558.

With the foregoing analysis in hand, we turn to the specific compilation before us.  BUC claimed copyright protection in the selection, order, and arrangement of information about yachts listed for sale.  Regardless of whether the yacht listings appear on a computer screen or in printed format, BUC's claim involves the selection, order and arrangement of the section headings, categories, and vessel inventory, i.e., the constituent elements of the BUCNET factual compilation.  For example, the choice of consistently presenting the "accommodations and layout" heading before the "engine and mechanical equipment" heading is manifested in the same way irrespective of the chosen medium.  Unlike the plaintiff in MiTek, BUC was not claiming infringement in the selection or arrangement embodied in a screen display or some other nonliteral element of its computer program.  Nor was BUC contending that IYC and MLS

---

[42]  We recognize that our en banc holding in BellSouth established the "substantial similarity" standard as the default mode of analysis for compilation copyright claims, BellSouth, 999 F.2d 1436, (11th Cir. 1993)(en banc), and that the MiTek decision does not explicitly reference BellSouth in its discussion of the applicable standard.  Nevertheless, we have no reason to doubt that the MiTek court was fully aware of our precedent in BellSouth; indeed, the same author of our BellSouth decision also penned the panel decision in MiTek.  In light of the MiTek court's clearly expressed judgment that its application of "virtual identicality" was limited to a specific factual context, we see no inconsistency with BellSouth.  Just as the MiTek court did not, we need not here attempt to distinguish the various factual contexts in which the "virtual identicality" standard would or would not apply.  Instead, we simply note that MiTek's holding is limited to a narrow factual context – one that we ultimately believe to be distinguishable from the instant case.  See discussion, infra.

Solutions had copied the overall appearance of the BUCNET program as viewed on a computer screen. BUC presented the jury with claims for the infringement of the selection, order and arrangement of a factual compilation, not the nonliteral elements of a computer program. "Substantial similarity" was, therefore, the appropriate standard. Appellants' argument that the court erred in submitting that standard to the jury accordingly fails.

3.

We ought not end this discussion, however, without commenting on the argument that the district court abused its discretion in refusing to entertain the merits of appellants' request to substitute "virtual identicality" for "substantial similarity" as the appropriate standard for judging whether appellants' compilation infringed the original elements of BUC's compilation.

The complaint in this case was filed in June 2002. Apple Computer, Inc. v. Microsoft Corp., 35 F.3d 1435 (9th Cir. 1994), the "virtual identicality" case defense counsel cited during the charge conference, had been on the books for nearly eight years.[43] MiTek, an Eleventh Circuit case, explicitly adopted the

_____

[43] As noted in note 38, supra, counsel did not provide the court with the Federal Reporter citation; counsel's reference was merely to "Apple Computer v. Microsoft."

Apple Computer "virtual identicality" standard in certain limited contexts.[44]  89

F.3d at 1558–59.  MiTek came down on August 5, 1996, two months shy of six

years before BUC's complaint was filed.  Defense counsel either overlooked

MiTek or concluded that it was inapposite, for they represented to the court in the

proposed jury instructions they filed prior to trial that "substantial similarity" was

the applicable standard.  Counsel reinforced that representation at trial by not

taking issue with BUC's attorney's comment in his opening statement to the jury –

that the evidence would show that the defendants' compilation was substantially

similar to the original elements of BUC's compilation.

Given this history, the court was understandably surprised when defense

counsel shifted gears during the charge conference and objected to the court's

proposed use of the "substantial similarity" standard.  Counsel gave no

explanation for their new position – all they said was that "virtual identicality"

was the standard to be used according to "Apple Computer v. Microsoft."  Did

---

[44]  The MiTek panel adopted the Ninth Circuit's standard thusly:

This circuit has not established the standard that should be used in analyzing claims of
compilation copyright infringement of non literal elements of a computer program.
Today, we join the Ninth Circuit in adopting the "bodily appropriation of expression" or
"virtual identicality" standard.  See Apple Computer, Inc. v. Microsoft Corp., 35 F.3d
1435, 1446 (9th Cir. 1994) . . . [.]

MiTek, 89 F.3d at 1558–59.

counsel furnish the court with a copy of that decision?  No.  Did counsel inform

the court that the Eleventh Circuit had adopted <u>Apple Computer</u>'s standard, but

did so in a case involving "non literal elements of a computer program"?  <u>MiTek</u>,

89 F.3d at 1559.  No.  What counsel did was to provide the court with the citation

to <u>Nautical Solutions Marketing, Inc. v. Boats.com</u>, which had been decided on

April 1, just one day before the charge conference was convened, and which

applied <u>MiTek</u>'s "virtual identicality" standard.  <u>See</u> 2004 WL 783121, at *3.  In

sum, defense counsel apparently expected the court, at the eleventh hour, to do

what counsel had not done – get out the law books, decide for itself which

standard applied, and then draft a set of jury instructions.

The court chose not to do that.  In its order denying the defendants' request

for a new trial on the ground that the court erred in using the words "substantial

similarity," the court said this:

> MLS Solutions waived any right to an instruction on virtual identicality.
> The Court's Scheduling Order . . . states that all proposed jury instructions
> must be submitted in writing one week prior to the calendar call.
> Specifically, all requested instructions must be typed on a separate page
> and, except for Eleventh Circuit Pattern instructions, must be supported by
> citations of authority. This requirement allows the Court sufficient time to
> conduct research on the proposed jury instructions . . . However, in this
> case, the request for an instruction on virtual identicality came minutes
> before closing arguments, and more importantly, the request did not include
> a written proposed instruction on virtual identicality.

<u>BUC Int'l Corp. v. Int'l Yacht Council Ltd.</u>, No. 02-60772-CIV, slip op. at 2 (S.D.

40

Fla. June 21, 2004) (order denying mot. for new trial). We would be hard pressed, indeed, to hold that given these circumstances, the district court abused its discretion.

## C.

Appellants lastly contend that the district court erred in entering, on receipt of the jury's verdicts, a declaratory judgment in favor of BUC on their counterclaims. Their counterclaims challenged the validity of BUC's copyrights. So did their answers to BUC's complaint, which denied the complaint's allegation that BUC owned valid copyrights. The jury rejected their denial, and upheld the complaint's allegation in answering "YES" to the first interrogatory the court submitted to it: "Does BUC own valid Copyright Registrations?". The issue thus becomes whether the jury's answer bound the district court. The answer is yes.

"It is well settled that where claims at law and in equity are joined and the legal claims are tried separately by a jury, the jury's verdict operates as a finding of fact binding on the trial court in its determination of the equitable claims." Dybczak v. Tuskegee Inst., 737 F.2d 1524, 1526–27 (11th Cir. 1984); see also Caban-Wheeler v. Elsea, 71 F.3d 837, 844 (11th Cir. 1996); C & W Leasing, Inc. v. Orix Credit Alliance, Inc., 957 F.2d 815, 821 (11th Cir. 1992).

The jury answered the first interrogatory after considering the court's

41

instruction that "the plaintiff has the burden of proving both of the following by a preponderance of the evidence: 1) the plaintiff is the owner of a valid copyright; and 2) the defendant copied, displayed or distributed original [elements] from the copyrighted work." The jury's determination that BUC's copyrights were valid was necessarily based on several factual findings, including that BUC's compilation contained original elements of creative authorship. In that the defendants had no objection to the jury instructions concerning originality and consented to the verdict form the jury responded to, the argument that the jury's findings were somehow tainted necessarily fails. The district court, in its evaluation of the declaratory judgment, was thus bound by the jury's finding that BUC owned valid copyrights.

The judgment of district court is affirmed in all respects.

SO ORDERED.